IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CARLOS BASKERVILLE, | : | |
| Plaintiff, | : | 1:15-cv-0209 |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| WARDEN DOMINICK DEROSE, | : | |
| *et al.*, | : | |
| Defendants. | : | |

## MEMORANDUM

### February 28, 2018

Plaintiff, Carlos Baskerville ("Baskerville"), an inmate presently
incarcerated at the State Correctional Institution at Houtzdale (SCI-Houtzdale),
filed the instant action pursuant to 42 U.S.C. § 1983, on January 28, 2015.  (Doc.
1).  The matter is presently proceeding *via* an amended complaint (Doc. 44-1) filed
on May 13, 2016.  Baskerville alleges that he "had a serious medical need and was
disregarded by Defendant Dr. William W. Young, M.D. ("Young") from
November 2013 to April 3, 2014." (*Id.* at p. 2, ¶ 12).  Specifically, Young
"disregarded all [Baskerville's] sick call request(s) as well as order a simple blood
test to determine whether [Baskerville] have [sic] [Myasthenia gravis]."  (*Id.* at ¶
17).

Presently pending is Young's motion (Doc. 61) for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the motion (Doc. 61) will be granted.

## I.    <u>STANDARD OF REVIEW</u>

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Id.*; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

2

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996). Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. FED. R. CIV. P. 56; *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Wooler v. Citizens Bank*, 274 F. App'x 177, 179 (3d Cir. 2008). The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex.* at 323; *see also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992). "[T]he non-moving party 'may not rely merely on allegations or denials in its own pleadings; rather, its response must . . . set out specific facts showing a genuine issue for trial.'" *Picozzi v. Haulderman*, 2011 WL 830331, *2 (M.D. Pa. 2011) (quoting FED. R. CIV. P. 56(e)(2)). "Inferences should be drawn in the light most favorable to the non-

moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of North America. Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## II. STATEMENT OF MATERIAL FACTS

Baskerville arrived at the Dauphin County Prison ("DCP"), on or about December 12, 2012. (Doc. 62, ¶ 7). He was medically screened, evaluated, and interviewed the following day. (Doc. 62, ¶¶ 8, 9; Doc. 64-2, ¶ 19).

On or about December 3, 2013, Baskerville filed an Inmate Request Form seeking an eye examination. (*Id.* at ¶11; *Id.* at ¶ 4). An examination by a Physician's Assistant ("PA") on December 4, 2013, resulted in a referral to optometry. (*Id.* at 12; *Id.* at 5, 22). A Medical Assistant ("MA") scheduled an appointment with an optometrist for January 10, 2014. (*Id.* at 13; *Id.*at 5, 23). On or about December 9, 2013, Baskerville filed a second request indicating his eyes were getting worse. (*Id.* at 14; *Id.* at 6). On December 17, 2013, a Licensed Practical Nurse ("LPN") informed him that a referral to ophthalmology was forthcoming. (Doc. 62, ¶ 15).

On or about January 4, 2014, he filed an Inmate Request Form seeking information concerning the treatment of his eyes. (*Id.* at 16). A PA evaluated him on January 7, 2014, and noted complaints of blurry vision in his left eye,

administered eye drops, and arranged for a referral to optometry. (Doc. 62, ¶ 17; Doc. 64-2, ¶ 16, 17).

Baskerville's January 9, 2014 optometric examination indicated Diplopia of the left eye and Ptosis of the right eye; the optometrist noted that the Ptosis could be congenital.[1]  (*Id.* at 18).  He filed another Inmate Request Form on January 14, 2014, inquiring about the next stage of his treatment and reporting "my vision is bad & my eyes are moving apart."  (Doc. 62, ¶ 19; Doc. 64-2, ¶ 8).  Following a January 17, 2014, appointment with a PA, Baskerville was referred to ophthalmology. (Doc. 62, ¶ 20).  On that date, the medical department also administered an electrocardiogram, ordered bloodwork, and prescribed Atenolol to treat his high blood pressure.  (*Id.*)

On or about February 26, 2014, Baskerville filed another Inmate Request Form indicating that he was losing patience with the lack of treatment because his eyes have been "messed up since Nov. 2013."  (Doc. 62, ¶ 22; Doc. 64-2, ¶ 9).  On February 28, 2014, an MA scheduled an appointment with HMC Eye Center for May 12, 2014. (Doc. 62, ¶ 23).

Baskerville states in his "Declaration in Opposition to Defendant's Motion for Summary Judgment" that he submitted an "Inmate Request" dated March 5,

_____

[1] According to the American Academy of Ophthalmology, Diplopia is commonly known as double vision and Ptosis is the drooping of the upper eyelid over the eye.  www.aao.org

2014, on the back of an Inmate Request Form. (*Id.* at ¶ 36). There are no Inmate Request Forms in the DCP records dated March 5, 2014; nor are there any Inmate Request Forms directed to Dr. Young during the relevant time period of November 2013 to April 3, 2014.[2] (Doc. 44-1, ¶ 12; Doc. 62, ¶ 36; Doc. 64-2, ¶¶ 36, 37).

Baskerville also submits an undated handwritten note stating the following: "On or about March 5th, 2014, I went to medical because I lost my motor functions in my hands and arms. I was told that blood work would be done, and that I didn't need to be taken to the outside Hospital, because my condition wasn't that serious." (Doc. 64-2, ¶ 12). There is no record of Baskerville being seen in the medical department on March 5, 2014. (Doc. 62-1, pp. 29, 30).

On March 11, 2014, Baskerville filed an Inmate Request Form addressed to "Medical Doctor Martin," a mental health doctor at DCP. (Doc. 62, ¶ 27; Doc. 64-1, p. 8, 10; Doc. 62-1, p. 25, 27).

Baskerville submits the declaration of Inmate Justin Baxter ("Baxter"). (Doc. 64-1, p. 12). Baxter states that he and Baskerville occupied the same DCP cell from January 20, 2013, to March 16, 2014. (*Id.*) He states that prior to April 3, 2014, "Prison medical official(s) refuse [sic] to treat Mr. Baskerville. For

---

[2] Baskerville's references to treatment by Young after these dates will be disregarded. The dates relevant to this action are dictated by the Amended Complaint, which identifies November 2013 to April 3, 2014 as the time period in which Young allegedly disregarded Baskerville's serious medical needs. (Doc. 44-1, p. 2, ¶ 12).

example, (1) I had to bathe Mr. Baskerville (2) I had to clothe Mr. Baskerville (3) I had to physically teach Mr. Baskerville proper exercise due to the lack of care by Prison Medical Official(s) i.e. Dr. William Young M.D." (*Id.*)

On or about March 18, 2014, Baskerville filed an Inmate Request Form, again requesting to see an eye doctor. (Doc. 62, ¶ 24). On March 20, 2014, he reported to a PA that he was experiencing the sudden onset of no strength in his arms for approximately two weeks, and an inability to completely lift his arms. (*Id.* at 25). The PA referred Baskerville's complaints of bilateral upper extremity weakness to Dr. Young. (*Id.*) The following day, Baskerville was evaluated by Dr. Young for complaints of bilateral upper extremity weakness. (*Id.* at 27). During his appointment, Baskerville reported that, two weeks prior, he experienced a sudden onset of weakness. (Doc. 62, ¶ 28; Doc. 64-2, ¶ 27). Dr. Young noted Baskerville's inability to follow his finger and completely raise his arms but indicated that he had the ability to remove his shirt and redress himself following the exam. (*Id.*; *Id.*). Dr. Young ordered a Comprehensive Metabolic Panel and CBC bloodwork and under the plan section noted "observing." (*Id.* at 29; *Id.* at 29). Baskerville was never placed on the Medical Unit for observation. (Doc. 64-2, ¶ 30).

On March 22, 2014, a Registered Nurse ("RN"), contacted the mental health doctor to inquire as to whether Baskerville's symptoms could be related to his "psych" medication. (Doc. 62, ¶ 30). The mental health doctor immediately discontinued Baskerville's Sinequan prescription on the basis that it could potentially be causing the neurological side effects. (*Id.* at 31).

The bloodwork was completed on March 24, 2014. (*Id.* at 29).

On April 3, 2014, at approximately 6:28 p.m., the medical department received a call to assess Baskerville. (Doc. 62, ¶ 32; Doc. 64-2, ¶ 25). An LPN found him sitting in a chair with his arms at his sides and talking without any slur. Because he had difficulty following the nurse's finger to the left, forming a fist, and squeezing the nurse's hand, the decision was made to transport him to Harrisburg Hospital for evaluation. (Doc. 62, ¶ 32; Doc. 64-2, ¶ 25). He was admitted to the hospital on that day and, after the administration of a battery of tests over the course of several days, for the first time, he was diagnosed with Myasthenia Gravis. (*Id.* at 33, 34-35; *Id.* at 32, 34-35; Doc. 62-1, pp. 51-58). "Myasthenia Gravis is characterized by weakness and rapid fatigue of any of the muscles under your voluntary control." www. mayoclinic.org.

## III.   DISCUSSION

This civil rights action is brought pursuant to 42 U.S.C. § 1983.  Section

1983 of Title 42 of the United States Code offers private citizens a cause of action

for violations of federal law by state officials.  *See* 42 U.S.C. § 1983.  The statute

provides, in pertinent part, as follows:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress. . . .

*Id*.; *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002); *Kneipp v.*

*Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a claim under §1983, a

plaintiff must allege "the violation of a right secured by the Constitution and laws

of the United States, and must show that the alleged deprivation was committed by

a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).

For the delay or denial of medical care to rise to a violation of the Eighth

Amendment's prohibition against cruel and unusual punishment, a prisoner must

demonstrate "(1) that defendants were deliberately indifferent to [his] medical

needs and (2) that those needs were serious."  *Rouse v. Plantier*, 182 F.3d 192, 197

(3d Cir. 1999).  Deliberate indifference requires proof that the official "knows of

and disregards an excessive risk to inmate health or safety." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Deliberate indifference has been found where a prison official: "(1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a nonmedical reason; or (3) prevents a prisoner from receiving needed or recommended treatment." *Rouse*, 182 F.3d at 197. Deference is given to prison medical authorities in the diagnosis and treatment of patients, and courts "disavow any attempt to second-guess the propriety or adequacy of a particular course of treatment . . . (which) remains a question of sound professional judgment." *Inmates of Allegheny Cnty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)). Allegations of negligent treatment or medical malpractice do not trigger constitutional protections. *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976).

In an effort to establish deliberate indifference, Baskerville argues that Young ignored his Inmate Requests for medical treatment and dismissed his symptoms as not serious during a March 5, 2014 medical department visit. He submits an undated handwritten note that sets forth a sequence of events commencing on March 5, 2014. (Doc. 64-1, p. 3). He indicates that he "lost motor

function" in his hands and arms, and that upon seeking medical attention, he was advised that bloodwork would be done and that he did not need to be transported to the hospital. He states that three days later, blood work was done, but he received no results. During the following 2 ½ weeks, he experienced excruciating pain, difficulty sleeping, chewing, swallowing, and performing basic motor functions which resulted in numerous falls and injuries. He indicates that numerous requests for medical attention went unanswered. Baskerville's cellmate also declares that while celled together between January 2013 and March 16, 2014, he witnessed Baskerville's medical struggles and the lack of medical care provided to him by Young.

This version of events has no support in the record. Initially, there are no Inmate Requests of record directed to Young. There is no record of a March 5, 2014, Inmate Request Form submitted by Baskerville, no documented visit to the medical department, or any indication that he requested or actively sought medical treatment for the sudden onset of upper extremity weakness on that date or at any time prior to March 20, 2014. The record unequivocally reveals that he first raised his upper extremity weakness with the medical department on March 20, 2014, when he advised the PA that he was experiencing weakness in his arms and hands, and having difficulty performing daily tasks. The PA immediately referred him to

the Young. When seen by Young on March 21, 2014, Baskerville reported that, two weeks prior, he experienced a sudden onset of weakness in his upper extremities. Young administered a full examination and ordered comprehensive blood work, and wrote "observing" in the plan section of the notes. (Doc. 62, ¶ 29). On March 22, 2014, at Young's direction, an MA contacted the mental health department to inquire whether any of the "psych" medications were causing the symptoms, which resulted in the immediate discontinuation of one of his medications. On March 24, 2014, the blood work ordered by Young was completed.

There is no credible evidence that Young had any knowledge of Baskerville's condition prior to March 21, 2014, or that he acted with deliberate indifference to Baskerville's serious medical condition once he became aware, *i.e.* denied him timely and appropriate treatment and, in doing so, inflicted pain or harm upon him. *See Farmer v. Carlson*, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988); *Rouse*, 182 F.3d at 197. Young examined Baskerville and took immediate measures to assist in discovering the etiology of his symptoms and rendering a diagnosis.

Baskerville also contends that Young never placed him on "medical observation" as planned, and that he failed to administer a simple blood test that

would have revealed his condition. Even if Young's intention was to place Baskerville on "medical observation," which is unclear from the medical notes, the failure to implement such a plan does not rise to the level of deliberate indifference. At most, it constitutes negligence. Further, the record is completely devoid of any evidence that a simple blood test would have unearthed a Myasthenia Gravis diagnosis, a diagnosis reached following several days in the hospital and a plethora of medical tests. (Doc. 62-1, pp. 51-58).

No claim of deliberate indifference is made out where a significant level of care has been provided, as is the case here, and all that is shown is that the prisoner disagrees with the professional judgment of a physician. *Estelle*, 429 U.S. at 105–06, 107 (finding that "in the medical context, . . . a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment"); *Parham v. Johnson*, 126 F.3d 454, 458 n. 7 (3d Cir. 1997) (recognizing "well-established law in this and virtually every circuit that actions characterizable as medical malpractice do not rise to the level of 'deliberate indifference' "); *Durmer v. O'Carroll*, 991 F.2d 64, 67 (1993) (same). Courts will not second guess whether a particular course of treatment is adequate or proper. *See Parham*, 126 F.3d at 458 n.7 (quoting *Inmates of Allegheny Cnty. Jail*, 612 F.2d at 762).

## IV.   __CONCLUSION__

Based on the foregoing, Defendant Young's motion (Doc. 61) for summary judgment will be granted.

An appropriate Order will issue.